**ALASKA AIRLINES, INC., et al., Plaintiffs,**

v.

**Raymond J. DONOVAN, et al., Defendants;**

**Air Line Pilots Association, International; Association of Flight Attendants; and Brotherhood of Railway and Airline Clerks, etc., Intervening Defendants.**

**Civ. A. No. 84–0485.**

United States District Court, District of Columbia.

May 18, 1984.

William T. Coleman, Jr., Richard C. Warmer, Donald T. Bliss, John Beisner, Washington, D.C., for plaintiffs.

Robert C. Seldon, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

This case challenges the validity of § 43 of the Airline Deregulation Act (ADA), Pub.L. No. 95–504, 92 Stat. 1705 (1978), as well as the validity of regulations implementing § 43. The federal government undertook extensive control over commercial airline operations beginning in the 1930's.

The Civil Aeronautics Act of 1938 and its successor, the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.*, granted to the Civil Aeronautics Board (CAB) broad powers to regulate nearly every aspect of the industry. This structure was dramatically altered in 1978, however, with the passage of the Airline Deregulation Act. In the sweeping provisions of this Act the CAB was directed to take steps to gradually lessen and finally abolish nearly all economic regulation of the airline industry; indeed, the Act provided for the CAB itself to go out of existence by 1985.[1]

In anticipation of the upheaval and possible economic hardship which might result from deregulation, Congress enacted as § 43 of the Act an "Employee Protection Program" (EPP). This provision had two closely linked components: an "assistance payments" program by which the Secretary of Labor, "subject to such amounts as are provided in appropriations Acts," would make monthly assistance payments to certain "protected" airline employees laid off as a result of deregulation, and a "first hire" program by which carriers certificated by the CAB as of a particular date would be required to hire "protected" employees laid off by other carriers before hiring other individuals not previously furloughed by the hiring airline itself. Many aspects of these programs were left unresolved by the terms of § 43.

The Secretary of Labor was directed by § 43(f) to issue the regulations necessary to carry out the Employee Protection Program within six months, subject to legislative veto before they became effective. Despite the six-month deadline, final regulations were not proposed for the "first hire" program until 1983. Airline Employee Protection Program, 48 Fed.Reg. 52,854 (Nov. 22, 1983). These regulations are now scheduled to become effective immediately. The Secretary has yet to issue regulations covering the assistance payments program, which Congress has never funded.

---

**1.** ADA § 40. Certain of the CAB's functions are to be transferred to other agencies. Safety regulation, which is controlled by the Federal Avia-  tion Administration, remains unaffected by the ADA.

Plaintiffs, fifteen airlines subject to these new regulations, challenge the validity of both the regulations and of § 43 itself. Several airline employee unions have intervened as defendants or filed briefs *amici curiae.* After full briefing and oral argument, cross-motions to dismiss or for summary judgment are now before the Court. Because the Court concludes that § 43 is unconstitutional in its entirety due to its special provision for a legislative veto, summary judgment must be granted for plaintiffs.[2]

Section 43(f) states:

(f) Rules and Regulations.—(1) The Secretary may issue, amend, and repeal such rules and regulations as may be necessary for the administration of this section.

(2) The rule containing the guidelines which is required to be promulgated pursuant to subsection (b) of this section and any other rules or regulations which the Secretary deems necessary to carry out this section shall be promulgated within six months after the date of enactment of this section.

(3) The Secretary shall not issue any rule or regulation as a final rule or regulation under this section until 30 legislative days after it has been submitted to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Public Works and Transportation of the House of Representatives. Any rule or regulation issued by the Secretary under this section as a final rule or regulation shall be submitted to the Congress and shall become effective 60 legislative days after the date of such submission, unless during that 60-day period either House adopts a resolution stating that that House disapproves such rules or regulations, except that such rules or regulations may be-

come effective on the date, during such 60-day period, that a resolution has been adopted by both Houses stating that the Congress approves of them.

(4) For purposes of this subsection, the term "legislative day" means a calendar day on which both Houses of Congress are in session.

■ As the government concedes, the legislative veto provision found in § 43(f)(3) is unconstitutional under the Supreme Court's holding in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The issue therefore is whether this defective portion of § 43 can be "severed" from the rest of that section and the remainder enforced as valid law, or whether the legislative veto provision is so fundamentally a part of that provision that it unconstitutionally infects the entire section.

■ The proper analysis to be followed in determining the issue of severability is well established. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independent of that which is not, the invalid part may be dropped if what is left is fully operative law." *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (*per curiam*), *quoting Champlin Refining Co. v. Corporation Commission,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932). *See also Chadha,* 103 S.Ct. at 2774. "[T]he crucial inquiry [is] whether Congress would have enacted other portions of the statute in the absence of the invalidated provision." *American Federation of Government Employees v. Pierce,* 697 F.2d 303, 307 (D.C.Cir.1982), *quoting Consumer Energy Council of America v. FERC,* 673 F.2d 425, 442 (D.C.Cir.1982), *aff'd mem.,* —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed. 1402 (1983).[3]

---

**2.** Plaintiffs' other legal contentions need not be reached.

**3.** The question is not, of course, whether Congress would have enacted *some* type of employee protection plan in the absence of a legislative veto provision; rather, the issue is whether Congress would have enacted the *same* statute. If

not, the Court cannot enforce the remainder of the statute merely because it might be an approximation of what Congress would have enacted. The task of determining the most preferable alternative to an unconstitutional statute belongs not to the courts, but to Congress itself.

Several aspects of § 43 lead the Court to conclude that Congress considered the legislative veto provision to be integral to the EPP and that Congress would not have enacted § 43 in its present form without such a provision. First, and most significant, § 43 is the only section in the entire Airline Deregulation Act where a legislative veto provision appears. Unlike with many other statutes, the Court is faced here not with a legislative veto provision which applies to an entire statute, but with a veto provision applicable to one, and only one, particular section of a long and comprehensive piece of legislation. It is apparent from the face of the statute, therefore, that Congress enacted § 43 with the understanding firmly in mind that regulations issued by the Secretary would be subject to legislative veto.

The importance to Congress of the legislative veto provision of § 43 is reinforced by the language of that section. Subsections 43(f)(3) and (4) provide very explicit procedures under which proposed regulations are subject to congressional review before they can become effective. Final regulations must be submitted for review to specific congressional committees 30 days before they are issued, and once issued do not become effective until both Houses of Congress have adopted resolutions approving the regulations or 60 "legislative" days have passed without either House adopting a resolution of disapproval. These elaborate procedures are, in fact, apparently unique among the nearly 200 statutory legislative veto provisions enacted by Congress in the extent to which they ensure congressional control over the regulatory process.[4]

The language of § 43's substantive provisions and the circumstances in which the ADA was enacted also support the view that Congress intended the veto provision to be integral to § 43. Both the assistance payment and first hire provisions provide the Secretary with only general guidance in determining how those programs should be structured and operated. Moreover, as the congressional debates make clear the effects of airline deregulation were highly uncertain. Congress obviously thus could not foresee the precise nature or cost of the EPP or the problems which might arise under it. Such circumstances are consistent with and reinforce indications in the language of the veto provision itself that Congress' grant of such broad authority to the Secretary was intended to be contingent on being subject to a legislative veto.

The government points out that there is relatively little discussion of the veto provision in the legislative history of the Act, at least with respect to the first hire program. The mere lack of extensive discussion of the veto provision, however, does not support the conclusion that Congress considered that provision insignificant, and what legislative history there is in fact supports the view that Congress considered the veto provision to be an important part of § 43. While the reasons for doing so are apparently not fully recorded, the Conference Committee report indicates that the legislative veto provision, taken from the Senate bill, was significantly strengthened before passage by the addition of the requirement that final regulations be submitted to Congress thirty days before they are issued. House Conf.R. No. 95–1779, 95th Cong., 2d Sess. 105–06 (1978), U.S. Code Cong. & Admin.News 1978, p. 3737. This refutes the notion that the veto provision was mere boilerplate with which Congress was little concerned. The legislative history thus casts "grave doubt" that Congress would have enacted the Employee Protection Program in its present form without the accompanying legislative veto provision. *See Pierce*, 697 F.2d at 307.

"Congress did not declare the [veto] clause ... to be severable," *Pierce*, 697

---

**4.** A summary of legislative veto provisions can be found in The Supreme Court Decision in *INS v. Chadha* and Its Implications for Congressional Oversight and Agency Rulemaking: Hearings Before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary, 98th Cong., 1st Sess. 24–72 (appended to statement of Edward C. Schmults, Deputy Attorney General).

F.2d at 307 n. 5, and a court cannot simply assume that it is severable. In the words of Justice Frankfurter, construing legislation "is nothing like a mechanical endeavor.... [I]nevitably there enters into the construction of statutes the play of judicial judgment within the limits of the relevant legislative materials. Most relevant, of course, is the very language in which Congress has expressed its policy and from which the Court must extract the meaning most appropriate." *Local 1976, United Brotherhood of Carpenters and Joiners of America v. NLRB*, 357 U.S. 93, 100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958). Here the statutory language directly links the admittedly unconstitutional provision with the specific grant of rulemaking authority under attack. Absent a responsible basis for concluding that Congress did not consider the veto provision a central if not essential component of that grant of authority, and would thus have enacted the remainder of § 43 in its present form without it, the veto provision cannot be severed and § 43 must be declared unconstitutional in its entirety. In the Court's judgment the other "relevant legislative materials" do not supply such a basis; if anything, they reinforce the view that the legislative veto provision was intended to be an integral part of the entire section.

Taking into account the content and structure of the Airline Deregulation Act, the circumstances surrounding its enactment, and its legislative history, the Court thus finds lacking "sufficient evidence that Congress would have enacted the [Employee Protection Plan] provision without regard to the clause [providing for a legislative veto]." *Pierce*, 697 F.2d at 307 n. 5. The Court therefore concludes that the unconstitutional legislative veto provision of § 43 is inextricably bound to the remainder of that section and that Congress would not have enacted the remainder of § 43 in its absence.[5] Accordingly, an Order declaring § 43 unconstitutional in its entirety has been filed herein.[6]

---

**5.** Defendants suggest that the Court cannot strike down § 43 in its entirety without also striking down the entire Airline Deregulation Act. The Court has little difficulty in rejecting this argument, and extended discussion is not necessary. The Court notes, however, that Congress clearly considered the Employee Protection Program to be an ancillary, preventative measure it did not even expect would be used; it was enacted to deal with the mere "theoretical possibility that a major reduction might occur in the labor force of one or more airlines" as a result of deregulation. S.Rep. No. 631, 95th Cong., 2d Sess. 113 (1978). Nothing in the statute or legislative history even remotely suggests that Congress would not have passed the Act without the EPP or that in the absence of an EPP it would have taken a different approach to deregulation.

**6.** The parties' cross-motions were argued to the Court on May 4, 1984. Based on representations made in a motion filed by plaintiffs on May 16, 1984, that the Department of Labor had announced that the disputed regulations would become effective the next day, the Court on May 17, 1984, issued its Order disposing of the case. That Order stated that this Memorandum giving the Court's reasons would be filed at a later date.