559 F.2d 1258
 William C. McCORKLE, Jr., on behalf of himself and all
others similarly situated, Appellant,
v.
The UNITED STATES, Robert E. Hampton, Chairman, U. S. Civil
Service Commission, James T. Lynn, Director,
Office of Management & Budget, Appellees.
 No. 76-1479.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 7, 1976.
Decided July 26, 1977.
 
 Lewis T. Booker, Richmond, Va. (Rand A. Mirante, Johnnie M. Walters, Washington, D. C., Hunton & Williams, Richmond, Va., on brief), for appellant.
 James R. Hubbard, Asst. U. S. Atty., Alexandria, Va. (William B. Cummings, U. S. Atty., Alexandria, Va., on brief), for appellees.
 Before TOM C. CLARK,* Associate Justice, retired, sitting by designation, and BUTZNER and WIDENER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 William C. McCorkle, on behalf of federal government employees whose salaries are determined by the pay rates for grades 15 to 18 of the General Schedule, appeals the judgment of the district court upholding the constitutionality of § 3(a) of the Federal Pay Comparability Act of 1970 (5 U.S.C. § 5308) and § 225(i)(1)(B) of the Federal Salary Act of 1967 (2 U.S.C. § 359(1)(B)). McCorkle contends that limiting the pay of General Schedule employees to an amount no higher than the salaries of Executive Schedule employees denies his class equal protection of the law in violation of the due process clause of the fifth amendment. He also contends that authorizing one house of Congress to veto the President's recommendations for Executive Schedule salaries is prohibited by the constitutional provisions for bicameral legislation, the presidential veto, and the separation of powers. He seeks a declaratory judgment that 5 U.S.C. § 5308 and 2 U.S.C. § 359(1)(B) are unconstitutional and that he and each member of his class are entitled to recover damages. For reasons that differ in some respects from those assigned by the district court, we affirm the dismissal of McCorkle's complaint.
 
 I.
 
 2
 The General Schedule establishes the basic pay system for most federal civilian, white collar employees. It contains 18 grades based upon degrees of responsibility and qualification. The Federal Pay Comparability Act authorizes the President to adjust salaries annually in accordance with the congressional policy set forth in §§ 5301[1] and 5308.
 
 
 3
 The target of McCorkle's complaint is § 5308 which provides:
 
 
 4
 Pay may not be paid, by reason of any provision of this subchapter, at a rate in excess of the rate of basic pay for level V of the Executive Schedule.
 
 
 5
 Thus, § 5308 imposes on McCorkle and his class a ceiling on their pay equivalent to the salary for a level V executive, the lowest of five grades in the Executive Schedule.
 
 
 6
 The Federal Salary Act authorizes the President to recommend adjustments in executive pay, including level V, every four years. Title 2 U.S.C. § 359 provides that these recommendations become effective unless the House and Senate enact different pay rates or either house disapproves of the recommendations.[2] In March, 1974, the Senate rejected the President's recommendation for an increase in the pay rate for level V executives.[3] Because of the ceiling set by the Federal Pay Comparability Act, 5 U.S.C. § 5308, and the Senate disapproval of the President's proposal, the top salaries for General Schedule employees remained at the rate previously set for level V. It is this pay freeze that McCorkle attacks as discriminatory.
 
 II.
 
 7
 McCorkle contends that § 5308 denies him equal protection of the law because the ceiling it imposes on some General Schedule pay rates is not rationally related to a legitimate legislative purpose. He claims that all General Schedule employees, including those in grades 15 to 18, are entitled to salaries determined by the principles in § 5301. He asserts that § 5308 invidiously discriminates between employees whose salaries have been increased annually because they are less than the level V ceiling and those whose salaries are frozen by the ceiling.
 
 
 8
 Since the pay system does not touch any fundamental right nor create a suspect classification, the statute complies with the equal protection component of the due process clause, as long as it rationally furthers legitimate, governmental purposes. Cf. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312-14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); see Buckley v. Valeo, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). To assess the rationality of the classification of employees created by the statute, we must examine its purpose in the context of the federal pay system for both General Schedule and Executive Schedule employees.
 
 
 9
 In establishing the policy governing the General and Executive Schedules, Congress intended that pay be commensurate with responsibility and that the relationship between salary schedules be appropriate. If General Schedule salaries exceeded compensation for federal executives, some employees would earn more money than others with greater responsibility. Also, some General Schedule employees would earn more than their bosses. Consequently, the ceiling on General Schedule salaries rationally furthers the congressional purpose of establishing a logical relationship between pay and responsibility. Cf. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).
 
 
 10
 Moreover, Congress determined that the pay rates for top level and lower level General Schedule employees involve different considerations. Explaining a similar ceiling on General Schedule salaries imposed by the Federal Salary Act of 1967, the Senate Report stated:
 
 
 11
 There is an unrealistic ceiling on Federal salaries at the highest levels which reflects the national sentiment that officers with great responsibility in the Government are bound as good citizens to make some personal financial sacrifice for their country and their Government while serving in appointive positions. But below that high level, career employees must be paid as well as if they worked in private enterprise. There is a direct and proved relationship between adequate pay and the willingness of any employee anywhere to do his best. The Government would be saving nothing and losing much if it did not recognize and follow this principle of equal pay for equal work for Federal employees.[4]
 
 
 12
 As Congress has subsequently acknowledged, the pay structure established by the Federal Pay Comparability Act does not entirely meet its objectives, because the compression of salaries at the General Schedule ceiling affects career incentive and morale.[5] The fifth amendment, however, does not require Congress to develop a perfect pay system. The ceiling imposed by § 5308 bears a reasonable relationship to Congress's objective of balancing fiscal responsibility with employee needs. Since it justifiably furthers legitimate purposes identified by Congress, § 5308 does not deny McCorkle and his fellow employees equal protection of the law. Cf. Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); Wisconsin National Organization for Women v. Wisconsin, 417 F.Supp. 978, 986 (W.D.Wis.1976); Bruce v. Scearce, 390 F.Supp. 297, 300-01 (E.D.Mo.), aff'd 521 F.2d 796 (8th Cir. 1975).
 
 III.
 
 13
 McCorkle also contends that the one-house veto of the President's recommendations for Executive Schedule salaries as provided in the Federal Salary Act, 2 U.S.C. § 359(1)(B),[6] is an unconstitutional delegation of legislative authority.[7] He claims that if the Senate had not acted unconstitutionally to disapprove the President's recommendations, the new rates of executive pay would have gone into effect automatically. This would have raised the level V ceiling and consequently increased his own pay.
 
 
 14
 The difficulty with McCorkle's position is his assumption that Congress would have enacted the Federal Salary Act without the provision for the legislative veto set forth in § 359(1)(B). This raises the question of the separability of this provision from the Act. Unless it is separable, McCorkle cannot recover damages even if it is, as he contends, unconstitutional. Lacking separability, the provisions for the President's recommendations would be deemed inoperative. 2 C. D. Sands, Statutes and Statutory Construction, §§ 44.03, 44.06 (4th ed. 1973). The canons of constitutional litigation dictate that we initially consider the statutory issue of separability before we turn to the question of constitutionality. See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).
 
 
 15
 In Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932), the Court stated that the separability of a statute should be determined by the following standard:
 
 
 16
 Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.
 
 
 17
 When the questioned clause restricts a power granted by the legislature, the case against severance is strong. Otherwise, the scope of the power would be enlarged beyond the legislature's intent. See Davis v. Wallace, 257 U.S. 478, 484, 42 S.Ct. 164, 66 L.Ed. 325 (1922); 2 C. D. Sands, Statutes and Statutory Construction, § 44.13 (4th ed. 1973).
 
 
 18
 Applying these rules of statutory construction to the Federal Salary Act of 1967, we conclude that the President's power to fix salaries is not separable from the restriction on this power embodied in the one-house veto. The Act provides that the President's recommendations for Executive Schedule salaries shall be effective unless (A) Congress enacts a statute which establishes different pay rates, or (B) either house disapproves of the recommendations.[8] Thus, the effectiveness of the President's recommendations depends on the acquiescence of both houses. The legislative history demonstrates that Congress would not have granted the President the power to set congressional, executive, and judicial salaries without this restriction.
 
 
 19
 The proposal for establishing salaries by presidential recommendation was vigorously debated by Congress because some members feared that it delegated to the President excessive authority over federal pay. In the House, Representative Gross offered an amendment to strike the provisions authorizing the President to make potentially binding recommendations. Representative Udall, the House floor manager, defended the bill by repeatedly emphasizing that Congress could veto the President's suggestions. He said that if the President's recommendation were arbitrary, "it would be vetoed by this House with 5 minutes of debate. . . ." 113 Cong.Rec. 28643 (1967).
 
 
 20
 The bill passed the House with the provision that the President's recommendations would become effective unless Congress disapproved of them or enacted pay legislation. The Senate, however, refused to authorize the President "to establish, affirmatively or negatively, the salaries of the Members of Congress" on the ground that allowing the President's recommendations to take effect in the manner provided by the House abdicated Congress's constitutional responsibility.[9] Following a conference, the Senate passed a compromise bill which essentially followed the House version. It acted only after considering assurances that either House could veto the President's recommendations. Senator Monroney, the Senate floor manager, explained:
 
 
 21
 If the (Senate) does not like (the salaries recommended by the President), a majority of one in either body can veto that plan and Congress can fix those salaries legislatively. We have not surrendered any power. We have the right to exercise the power whenever such plan does not meet the consensus of the majority of one in either house.
 
 
 22
 . . . Either House, by a majority of one, can reject or modify the plan. So the power rests with the congressional branch. 113 Cong.Rec. 36108 (1967).
 
 
 23
 Voiding the one-house veto as unconstitutional while leaving presidential authority intact would increase the President's power over salaries far beyond the intention of Congress. We are satisfied that the legislative history establishes that Congress would not have delegated authority to the President to establish salaries without the provision for the one-house veto. Thus, § 359(1)(B) creating the veto is inseparable from those parts of the statute that empower the President to make potentially binding recommendations. If the veto were unconstitutional, as McCorkle contends, the provisions for the President's recommendations to become effective could not stand in isolation. Accordingly, McCorkle would not be entitled to damages based on these recommendations.
 
 IV.
 
 24
 We also conclude that McCorkle is not entitled to a judgment declaring whether § 359(1)(B) is constitutional. An important question of public law should not be resolved by a declaratory judgment if that judgment would be futile. The court should be able to see "what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." Public Service Commission v. Wycoff Co., 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952); see E. Borchard, Declaratory Judgments 299 (2d ed. 1941); C. Wright & A. Miller, Federal Practice and Procedure, §§ 2759, 2763 (1973).
 
 
 25
 As explained in Part III, McCorkle could not recover damages even if he prevailed on his contention that § 359(1)(B) is unconstitutional. Moreover, while this appeal was pending, Congress amended § 359(1)(B) to provide that the President's recommendations shall become effective only if both houses of Congress approve.[10] Because the statute no longer provides for a one-house veto, a declaratory judgment concerning the constitutionality of this legislative check on executive action would not affect the procedure used to determine McCorkle's future pay. We therefore conclude that a declaratory judgment should be denied because it would not serve a useful purpose in settling the controversy.
 
 
 26
 Affirmed.
 
 
 
 *
 Mr. Justice Clark died before this opinion was prepared
 
 
 [1]
 5 U.S.C. § 5301 provides in part:
 (a) It is the policy of Congress that Federal pay fixing for employees under statutory pay systems be based on the principles that
 (1) there be equal pay for substantially equal work;
 (2) pay distinctions be maintained in keeping with work and performance distinctions;
 (3) Federal pay rates be comparable with private enterprise pay rates for the same levels of work; and
 (4) pay levels for the statutory pay systems be interrelated.
 (b) The pay rates of each statutory pay system shall be fixed and adjusted in accordance with the principles under subsection (a) of this section and the provisions of (section) . . . 5308 of this title.
 
 
 [2]
 2 U.S.C. § 359(1) provides in part:
 (A)ll or part (as the case may be) of the recommendations of the President transmitted to the Congress in the budget under section 358 of this title shall become effective at the beginning of the first pay period which begins after the thirtieth day following the transmittal of such recommendations in the budget; but only to the extent that, between the date of transmittal of such recommendations in the budget and the beginning of such first pay period
 (A) there has not been enacted into law a statute which establishes rates of pay other than those proposed by all or part of such recommendations,
 (B) neither House of the Congress has enacted legislation which specifically disapproves all or part of such recommendations, or
 (C) both.
 
 
 [3]
 S. Res. 293, 93rd Cong., 2d Sess., 120 Cong.Rec. 5508 (1974)
 
 
 [4]
 S.Rep.No.801, 90th Cong., 1st Sess. 24, reprinted in (1967) U.S.Code Cong. & Ad.News 2258, 2281
 
 
 [5]
 S.Rep.No.94-333, 94th Cong., 1st Sess. 4-8, reprinted in (1975) U.S.Code Cong. & Ad.News 845, 848-852
 
 
 [6]
 See supra note 2
 
 
 [7]
 In Atkins v. United States, 556 F.2d 1028 (Ct.Cl., 1977), the court upheld the constitutionality of § 359(1)(B). The dissenting opinion maintained that this part of the statute was unconstitutional and severable from the rest of the Act
 
 
 [8]
 See supra note 2
 
 
 [9]
 S.Rep.No. 801, 90th Cong., 1st Sess. 25, reprinted in (1967) U.S.Code Cong. & Ad.News 2258, 2282
 
 
 [10]
 Act of April 12, 1977, Pub.L.No. 95-19, § 401, 91 Stat. 39