NATIONAL TREASURY EMPLOYEES
UNION, et al., Plaintiffs,

v.

Ronald REAGAN and United States of
America, Defendants.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL–CIO, et al., Plaintiffs,

v.

Ronald REAGAN and United States of
America, Defendants.

Civ. A. Nos. 84–2654, 83–1914.

United States District Court,
District of Columbia.

July 31, 1985.

Lois G. Williams, Director of Litigation and Richard Edelman, Asst. Counsel, Nat. Treasury Employees Union, Washington, D.C., for plaintiff Nat. Treasury Employees Union.

Charles A. Hobbie, Washington, D.C., for plaintiff American Federation of Government Employees, AFL–CIO.

Neil H. Koslowe, U.S. Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM

GASCH, Senior District Judge.

These are actions challenging the constitutionality of the Federal Pay Comparability Act, 5 U.S.C. § 5301 *et seq.*, based on the Act's one-House legislative veto provision, and the authority of the President to implement an "alternative pay plan" under the Act.[1] Presently before the Court is defendants' motion for judgment on the pleadings in *National Treasury Employees Union v. Reagan* and cross-motions for summary judgment in both cases. For the reasons set forth below, the Court denies defendants' motion for judgment on the

---

1. These cases, which have not been consolidated, raise virtually identical issues, and for convenience, the Court addresses in one opinion the issues pending before the Court.

pleadings and grants defendants' motions for summary judgment.

BACKGROUND

Plaintiff American Federation of Government Employees AFL–CIO ("AFGE") is an unincorporated association having its principal place of business in Washington, D.C. It is the exclusive bargaining representative for about 690,000 federal employees. The other named plaintiffs in *AFGE v. Reagan* [2] are members of AFGE who work and reside in the District of Columbia and who are federal employees paid under the General Schedule whose rates of pay were adjusted under the alternative pay plans submitted by the President for fiscal years 1980, 1981, 1983 and 1985 under the Federal Pay Comparability Act ("Pay Act").

Plaintiff National Treasury Employees Union ("NTEU") is an unincorporated association having its principal place of business in Washington, D.C. It is the exclusive bargaining representative for approximately 110,000 federal employees. Named plaintiff Haamid Nuriddin is a member of NTEU who works and resides in the District of Columbia and who, like the AFGE individual plaintiffs, is a federal employee whose pay was adjusted under the 1985 fiscal year alternative pay plan.[3]

The Pay Act provides the statutory mechanism for annual adjustment in the rates of pay of federal employees subject to statutory pay systems. It implements the Congressional policy that federal pay for employees under statutory pay systems (1) provide equal pay for substantially equal work; (2) maintain pay distinctions in keeping with work and performance distinctions; (3) make federal pay rates comparable with private sector pay rates for the same levels of work; and (4) ensure that pay levels for the statutory pay systems are interrelated. *See* 5 U.S.C. § 5301(a).

The Pay Act directs the President to select a Pay Agent to prepare an annual report comparing rates of pay in private enterprise with rates in the statutory pay systems and recommending appropriate adjustments for federal salaries. 5 U.S.C. § 5305(a)(1). Section 5305(b) establishes procedures to be followed by the Pay Agent in arriving at a recommended increase. After considering the Pay Agent's report and the findings and recommendations of the Advisory Committee on Federal Pay established pursuant to 5 U.S.C. § 5306, the President adjusts the rates of pay of each statutory pay system in accordance with the principles set forth in Section 5301(a). 5 U.S.C. § 5305(a)(2). The pay adjustment becomes effective without any further Congressional action as of the beginning of the first applicable pay period beginning on or after October 1 of the applicable year. *Id.*

If national emergency or economic conditions affecting the general welfare render a pay adjustment required by Section 5305(a) inappropriate, the President may prepare and transmit to Congress before September 1 of that year an alternative plan for pay adjustments. 5 U.S.C. § 5305(c)(1). The alternative pay plan becomes effective on the first day of the first applicable pay period beginning on or after October 1 of that year unless, within 30 days of transmittal, either House adopts a resolution disapproving the alternative pay plan. 5 U.S.C. § 5305(c)(2). If the alternative pay adjustment plan is disapproved, the President must adjust pay in accordance with the four principles of comparability set forth in 5 U.S.C. § 5305(a)(2), (3). 5 U.S.C. § 5305(c)(2), (m).

AFGE challenges the President's alternative pay adjustment plans for fiscal years 1980, 1981, 1983 and 1985; NTEU challenges only the fiscal year 1985 plan.

On August 31, 1979, President Carter sent to Congress an alternative pay plan proposing an average increase of 7.02% in GS pay rates for fiscal year 1980, in lieu of an average comparability increase of 10.4% recommended by his pay agent. Neither

**2.** Thomas C. Lipscomb, Anita Longstreet, and Cecilia Westray.

**3.** Other individual plaintiffs in *NTEU v. Reagan* reside outside the District of Columbia.

House of Congress disapproved. On October 9, 1979, President Carter issued Executive Order No. 12165, 44 Fed.Reg. 58671 (1979), which increased GS pay rates by an average 7.02% beginning the first day of the first applicable pay period on or after October 1, 1979, and continuing through September 30, 1980. AFGE Motion for Summary Judgment at 6 ("AFGE Motion"); Defendants' Motion for Summary Judgment in *NTEU v. Reagan* at 8 ("Defendants' Motion").

On August 29, 1980, President Carter sent to Congress an alternative pay plan proposing an average increase of 9.1% in GS pay rates for fiscal year 1981, in lieu of an average comparability increase of 13.5% recommended by his pay agent. Neither House of Congress disapproved. On October 16, 1980, President Carter issued Executive Order No. 12248, 45 Fed.Reg. 69199 (1980), which increased GS pay rates by an average 9.1% beginning the first day of the first applicable pay period on or after October 1, 1980, and continuing through September 30, 1981. AFGE Motion at 7; Defendants' Motion at 8.

On August 26, 1982, President Reagan sent to Congress an alternative pay plan proposing an average increase of 4% in GS pay rates for fiscal year 1983, in lieu of an average comparability increase of 18.47% recommended by his pay agent. Neither House of Congress disapproved. On October 8, 1982, President Reagan issued Executive Order No. 12387, 47 Fed.Reg. 44981 (1982), which increased GS pay rates by an average 4% beginning the first day of the first applicable pay period on or after October 1, 1982, and continuing through September 30, 1983. AFGE Motion at 7; Defendants' Motion at 8–9.

On August 30, 1984, President Reagan sent to Congress an alternative pay plan proposing no increase in GS pay rates for the first three months of fiscal year 1985 and an average 3.5% increase beginning the first day of the first applicable pay period on or after January 1, 1985, in lieu of an average comparability increase of 18.28% recommended by his pay agent. Neither

House of Congress disapproved. The 3.5% increase became effective on January 1, 1985, continuing through September 30, 1985. AFGE Motion at 7; NTEU Motion for Summary Judgment at 11; Defendants' Motion at 8–9.

DISCUSSION

I.

■ Defendants contend that this Court does not have jurisdiction over NTEU's and AFGE's actions because under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491, they can only be brought in the United States Claims Court. Section 1346(a)(2) gives district courts concurrent jurisdiction with the Claims Court over "any ... civil action or claims against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department," 28 U.S.C. § 1346(a)(2), that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. Mitchell,* 463 U.S. 206, 217, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983). The Claims Court has exclusive jurisdiction of such claims exceeding $10,000. 28 U.S.C. § 1491.

This Court has concurrent jurisdiction with the Claims Court over AFGE's and NTEU's claims. Although AFGE and NTEU seek declaratory and injunctive relief and a writ of mandamus, its actions are really for money damages from the Government—increased federal pay for its members for fiscal years 1980, 1981, 1983 and 1985. District court jurisdiction under the Tucker Act cannot be avoided by framing an essentially monetary claim, such as AFGE's and NTEU's, in terms of injunctive, declaratory or mandatory relief. *Van Drasek v. Lehman,* 762 F.2d 1065, 1071 n. 11 (D.C.Cir.1985); *Portsmouth Redevelopment and Housing Authority v. Pierce,* 706 F.2d 471, 474 (4th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Jesko v. United States,* 713 F.2d 565, 566 (10th Cir.1983); *Davila v. Weinberger,* 600 F.Supp. 599, 602 (D.D.C.1985).

Defendants assert, however, that the amount of NTEU's and AFGE's claims must be calculated by aggregating the claims of their respective members, thereby exceeding the $10,000 limit and vesting exclusive jurisdiction to hear these actions in the Claims Court.[4] Defendants' argument is without merit. It is well established that aggregation of claims to establish the jurisdictional amount is permissible "when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest." *Zahn v. International Paper Company*, 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973). If, however, two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, each plaintiff must satisfy the jurisdictional amount requirement. *Id.; Snyder v. Harris*, 394 U.S. 332, 336, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969). Here, the members of NTEU and AFGE who are represented by such organizations have separate and distinct claims.

*NTEU v. Nixon*, 492 F.2d 587 (D.C.Cir. 1974), which also involved a challenge to the Federal Pay Comparability Act, suggests that aggregation of the individual claims of NTEU's and AFGE's members is impermissible in the actions before this Court. In that case, NTEU sued President Nixon to adjust the pay of federal employees as mandated by the Federal Pay Comparability Act. NTEU sought, *inter alia,* monetary damages on behalf of its members. The Court found that it lacked federal question jurisdiction, which then required that the amount in controversy exceed $10,000, because no individual plaintiff had a claim exceeding that amount. The Court stated that aggregation of individual claims was not permitted under *Snyder v. Harris* for purposes of meeting the jurisdictional amount.[5]

*Local Division No. 714 v. Greater Portland Transit District*, 589 F.2d 1 (1st Cir. 1978), on which defendants rely, is distinguishable from the instant cases. In *Greater Portland*, the First Circuit held that the plaintiff union, a representative plaintiff, could aggregate the claims of its individual members to establish the $10,000 jurisdictional amount, which was then required for federal question jurisdiction. The Court reasoned that the individual union members were not united merely for litigation convenience and economy, but rather were united "by the Union in conformance with the fundamental premise of collective bargaining that a union is to represent its members in all aspects of the labor-management relationship." 589 F.2d at 10. Significantly, the Court stated that the right to interest arbitration, which was at issue, could not be viewed practically as a right possessed by each employee individually because it could only be exercised collectively, making it a "single right." In contrast, the individual members of NTEU and AFGE possess separate, distinct claims, an increase in their federal pay for the years in question. There is no "single right" at issue. Each member could sue individually for the increased pay he or she seeks.

The government also claims that venue is improper as to those plaintiffs not residing in the District of Columbia. The Tucker Act requires district court actions to be brought in the judicial district where the plaintiff resides. 28 U.S.C. § 1402(a)(1). Venue is proper as to NTEU, AFGE and those individual plaintiffs residing in the District of Columbia.[6] As to the remaining individual plaintiffs, their claims must be dismissed for improper venue.

## II.

Defendants concede that the one-House legislative veto in the alternative

4. There is no dispute that this court has jurisdiction under the Tucker Act over the claims of those individually named plaintiffs who reside in the District of Columbia, as they each seek less than $10,000 in money damages. *See* n. 6 at 765.

5. The Court held that subject matter jurisdiction existed based on plaintiff's claim for mandamus relief under 28 U.S.C. § 1361.

6. Haamid Nurridin in Civil Action No. 84–2654 and Thomas C. Lipscomb, Anita Longstreet and Cecilia Westray in Civil Action No. 83–1914.

pay plan section of the Pay Act is unconstitutional under *Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Thus, the issue before the Court is whether the unconstitutional legislative veto provision is severable from the remainder of the alternative pay plan portion, leaving the alternative pay plan intact.

Plaintiffs argue that the one-House legislative veto is an integral and necessary part of the alternative pay plan provision and that if the legislative veto is severed from the alternative pay plan procedure, the main purpose of the statute, comparability for federal employee salaries, would be subverted. Thus, they contend, it is inconceivable that Congress would have passed the alternative plan provision allowing the President to set federal pay rates without retaining direct veto authority over the President's recommendation. Defendants assert that the alternative pay plan, which was viewed by Congress as a vital safety valve in the pay setting process, remains fully operable without the one-House legislative veto since Congress retains authority to review and reject alternative pay plans through its power to legislate.

In *Chadha,* the Supreme Court reaffirmed the test for determining severability of an unconstitutional one-House veto provision. The Court stated that "the invalid portions of a statute are to be severed ' "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." ' " *INS v. Chadha,* 462 U.S. at 932, 103 S.Ct. at 2774. Recently, this Circuit further explained this test in *Alaska Airlines, Inc. v. Donovan,* 766 F.2d 1550 (D.C.Cir.1985):

> Only if we conclude that Congress would not have included a provision absent the constitutionally flawed portion is that provision to fall. The issue cannot be whether Congress preferred the statute

with the unconstitutional provision over the same statute without that provision. Manifestly, Congress' preference is abundantly clear from its inclusion of the unconstitutional provision. Nor is the question whether Congress would have passed some alternative version of the statute if it knew that it could not lawfully have included the offending provision. That is, "the question is not whether Congress would have enacted th[is] *exact* statute [ ] had it known at the time of enactment that the legislative veto provisions were invalid, but rather, whether Congress would have preferred th[is] statute [ ], after severance of the legislative veto provision [ ], to no statute [ ] at all." *Gulf Oil Corp. v. Dyke,* 734 F.2d 797, 804 (T.E.C.A.) (emphasis in original), *cert. denied,* [—— U.S. ——], 105 S.Ct. 173 [83 L.Ed.2d 108] (1984).

766 F.2d at 1560.

There is a presumption of severability of the unconstitutional provision if what remains after severance is fully operable as law. *INS v. Chadha,* 462 U.S. at 934, 103 S.Ct. at 2775; *Alaska Airlines, Inc. v. Donovan,* 766 F.2d at 1559. Plaintiffs thus have the burden of demonstrating that Congress would not have enacted the provision without the severed portion. *Alaska Airlines v. Donovan,* 766 F.2d at 1560. Moreover, plaintiffs' burden is made even more difficult by the well-established principle of statutory construction that it is the responsibility of the Court to save and not to destroy, consistent with legislative intent. *Id.* at 1560.[7]

Mindful of the foregoing principles, and based on its review of the legislative history of the Pay Act, the Court concludes that the unconstitutional one-House veto provision is severable from the alternative pay plan procedure. Plaintiffs have failed to meet their burden of demonstrating that Congress would not have enacted the alternative pay plan procedure without the legislative veto and that the alternative pay

---

**7.** It is unclear to what extent the absence of a severability clause, as in this case, affects the determination of whether a provision is severable. *Alaska Airlines, Inc. v. Donovan,* at 1559 n. 7.

plan is not fully operable as law without the one-House veto.

There is no persuasive evidence that Congress would have preferred no alternative pay plan provision at all to one without a one-House veto. Contrary to plaintiffs' characterization of the alternative pay plan as a limited exception to the principle of comparability which the plan was designed to achieve, the legislative history of the Pay Act indicates that it was an important "safety valve" and an integral part of the comprehensive scheme for setting federal employees' salaries. Congress recognized that comparability of pay adjustments for federal employees might not be feasible or in the nation's interest due to inflation, budget concerns, other economic conditions or national emergencies. (116 Cong.Rec. 44096, 44099, 44103, (1970)). It enacted the alternative pay plan provision to ensure against automatic comparability pay adjustments without consideration of economic realities.

Moreover, Congress would not have enacted a comprehensive scheme for pay adjustments for federal employees without providing an important role for the President, even absent the one-House veto. Without the alternative pay plan provision, the President's role would be reduced to merely a ministerial function of reporting to Congress the recommendations of his Pay Agent and the Advisory Committee on Federal Pay. Indeed, the alternative pay plan was proposed as a conference substitute after the Senate rejected an earlier House proposal that bypassed the President altogether and provided for a Federal Employee Salary Commission to recommend to Congress pay adjustments that would become effective upon Congressional approval. The alternative pay plan, even without the one-House veto, implements Congress' intent to relieve itself of the burden of setting federal pay on an annual basis, particularly in election years, and to establish general principles of pay comparability to be implemented by the Executive Branch.

Although the alternative pay plan provision received considerable attention during the floor debate on the Pay Act, there is little discussion of the one-House veto. Much of the criticism of the alternative pay plan was directed at Congress' perceived lack of choice in that it would be left with the pay agent's recommendations to implement if it rejected the President's plan. Instead of relying on the one-House veto, proponents of the alternative pay plan consistently refuted this argument by noting that Congress always had the option of passing a law if it didn't like the President's plan or the pay agent's recommendations. (116 Cong.Rec. 44100, 44101–02, 44104–05, 44284 (1970)). Even Representative Udall, who was one of the drafters of the conference committee substitute which contained the alternative pay plan provision and who viewed the one-House veto as a way to guarantee that Congress would have an opportunity to review the President's plan, recognized that the ultimate means for Congress to ensure control over the pay setting process was to exercise its authority to legislate. (116 Cong.Rec. 44284.)

What remains of the Pay Act without the one-House veto provision is fully operable as a law. If the President submits an alternative pay plan and Congress disagrees, Congress can enact legislation to set the pay adjustment at the level it desires. Indeed, Congress did that in 1984 when it passed the Omnibus Reconciliation Act of 1983, Pub.L. No. 98–270, 98 Stat. 157, which overrode the President's fiscal year 1984 alternative pay plan. Congress also retains oversight by requiring the President to report his alternative pay plan to Congress. Thus, contrary to plaintiffs' assertions, the President is not delegated virtually limitless authority to set federal salaries without any Congressional oversight or without general policy guidelines from Congress for determining pay adjustments.

### III.

■ NTEU argues that even if the one-House veto is severable from the alternative pay plan provision, the 1985 fiscal year

alternative pay plan violates the Pay Act because it provides for pay increases effective on the first day of the first applicable pay period beginning on or after January 1, 1985 instead of October 1, 1984, as required by the Pay Act. The Pay Act provides in pertinent part:

> An alternative plan transmitted by the President under paragraph (1) of this subsection becomes effective on the first day of the first applicable pay period commencing on or after October 1, of the applicable year.

5 U.S.C. § 5305(c)(2).

The plain meaning of the statute indicates that the pay plan becomes effective on or after October 1st and that pay adjustments provided for in the plan become effective as specified in the plan.[8] Moreover, dicta in *NTEU v. Nixon*, 492 F.2d 587 (D.C. Cir.1974) suggests that that Court found nothing illegal about the alternative pay plan President Nixon submitted to Congress on September 1, 1971, which provided for no salary increase for the first six months of fiscal year 1972 and for a comparability increase for the remainder of the year. Similarly, the fiscal year 1985 pay plan provides for no increase for GS employees for the first three months of the fiscal year and a 3.5% increase effective beginning the first date of the first applicable pay period beginning on or after January 1, 1985.

## SUMMARY

This court has jurisdiction under the Tucker Act over the claims of AFGE, NTEU and the individual plaintiffs who reside in the District of Columbia. The claims of all of the members of AFGE and NTEU may not be aggregated to determine Tucker Act jurisdiction.

Applying the standard for severability established in *Chadha*, the Court holds that the unconstitutional one-House veto provision in Section 5305(c)(2) of the Pay Act is severable from the remainder of that section and the Pay Act. Accordingly, the alternative pay plan provision, without the one-House veto, is valid. The 1985 fiscal year alternative pay plan, which provides for a pay adjustment effective the first applicable pay period beginning on or after January 1, 1985, rather than October 1, 1984, is valid under the Pay Act.

## ORDER

Upon consideration of defendants' motion for judgment on the pleadings in Civil Action No. 84–2654 and the parties' cross-motions for summary judgment in Civil Action Nos. 83–1914 and 84–2654, the memoranda in support thereof and in opposition thereto, oral arguments of counsel, and the entire record herein, and for the reasons set forth in the accompanying memorandum, it is by the Court this 31st day of July 1985,

ORDERED that defendants' motion for judgment on the pleadings in Civil Action No. 84–2654 be, and hereby is, denied; and it is further

ORDERED that defendants' motions for summary judgment in Civil Action Nos. 83–1914 and 84–2654, be, and hereby, are granted; and it is further

ORDERED that the claims of the individual plaintiffs in Civil Action 84–2654 who reside outside the District of Columbia be, and hereby are, dismissed for improper venue.

---

**8.** This Court previously interpreted the Pay Act in this manner when it denied AFGE's motion for preliminary injunction. Memorandum of October 21, 1983 at 3.