**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, and National Treasury Employees Union, et al., Appellants,**

v.

**Ronald REAGAN, et al., Appellees.**

**Appeal Nos. 85–2649, 85–2652.**

United States Court of Appeals, Federal Circuit.

Dec. 2, 1986.

Charles A. Hobbie, Deputy Gen. Counsel, American Federation of Government Employees, AFL–CIO, Washington, D.C., argued for appellant AFGE. With him on the brief was Mark D. Roth, Gen. Counsel.

Lois G. Williams, Director of Litigation, Nat. Treasury Employees Union, Washington, D.C., argued for appellant NTEU. With her on the brief was Richard S. Edelman, Asst. Counsel.

Neil H. Koslowe, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Asst. Atty. Gen., Joseph Digenova, U.S. Atty. and Anthony J. Steinmeyer, Asst. Director.

Before NIES, Circuit Judge, NICHOLS, Senior Circuit Judge, and BISSELL, Circuit Judge.

BISSELL, Circuit Judge.

This is a consolidated appeal from the order of the district court, *National Treasury Employees Union v. Reagan*, 629 F.Supp. 762 (D.D.C.1985), granting appellees' motion for summary judgment, on the grounds that, after severing an unconstitutional one-House veto provision from the Federal Pay Comparability Act of 1970, Pub.L. No. 91–656, 84 Stat. 1946 (1971) (the Pay Act), the alternative pay plan provision of the Act is not unconstitutional and that the federal pay plan implemented for fiscal year 1984 complied with the terms of the Act. Our jurisdiction of this appeal is derived from 28 U.S.C. § 1295(a)(2) (1982). We affirm.

## BACKGROUND

The Pay Act provides a mechanism for the annual adjustment of the pay rates of federal employees in the statutory pay systems for the purpose of achieving pay comparability with employees in the private sector doing substantially equal work. Un-

der the Act, the President appoints a pay agent who prepares an annual report comparing salaries of federal employees with salaries of private sector employees and recommending appropriate adjustments in federal salaries. The pay agent submits the report to the President and also to the Advisory Committee on Federal Pay. The Advisory Committee on Federal Pay reviews the report and makes additional recommendations to the President.

Based on the pay agent's report and the recommendations of the Advisory Committee on Federal Pay, the President is to adjust federal employees' pay in accordance with the principles of 5 U.S.C. § 5301(a) (1982) providing for pay comparability with the private sector. The President is required to transmit to Congress a report of the pay adjustment together with the pay agent's report and the report of the Advisory Committee on Federal Pay.

The Act provides an alternative plan for adjusting statutory pay rates. "If, because of national emergency or economic conditions affecting the general welfare" the President considers it "inappropriate to make the pay adjustment required" by 5 U.S.C. § 5305(a), the President may prepare and transmit to Congress an "alternative plan with respect to a pay adjustment as he considers appropriate, together with the reasons therefor, in lieu of the pay adjustments required" by section 5305(a). 5 U.S.C. § 5305(c)(1).

The Act also provides for a legislative veto of the alternative plan. The alternative plan submitted by the President becomes effective on the first day of the first applicable pay period commencing on or after October 1 of the applicable year and continues in effect unless, before the end of the first period of 30 calendar days of continuous session of Congress after the date the plan is transmitted, either House adopts a resolution disapproving it. 5 U.S.C. § 5305(c)(2). If either House adopts a resolution disapproving the alternative plan, the Act requires the President to adjust pay rates in accordance with section 5305(a)(2) and (3) "effective as of the begin-

ning of the first applicable pay period commencing on or after the date on which the resolution is adopted, or on or after October 1, whichever is later." 5 U.S.C. § 5305(m).

For fiscal years 1980, 1981, 1983, and 1985, the President submitted to Congress alternative plans proposing increases less than those recommended by his pay agent. Neither House of Congress disapproved and in each year the pay increase proposed by the President became effective. In fiscal year 1982, Congress enacted the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 1701, 95 Stat. 357, 753, section 1701(a) of which provided for a cap of 4.8 percent on the adjustment of statutory pay rates under 5 U.S.C. § 5305. In fiscal year 1984, Congress enacted the Omnibus Budget Reconciliation Act of 1983, Pub.L. No. 98–270, § 202, 98 Stat. 157, 158 (1984), section 202(a)(1) of which provided that the adjustment to statutory pay rates under 5 U.S.C. § 5305 would be 4 percent.

Appellants American Federation of Government Employees, AFL–CIO (AFGE) and National Treasury Employees Union (NTEU) are unincorporated associations based in Washington, D.C. AFGE and NTEU are the exclusive bargaining representatives of federal employees whose pay was adjusted under alternative pay plans submitted by the President in 1980, 1981, 1983, and 1985. The other named appellants are members of AFGE and NTEU who reside in Washington, D.C.

This matter came before the district court on the defendants' motion for judgment on the pleadings in *NTEU v. Reagan* and on cross motions for summary judgment in both cases. The district court denied the defendants' motion for judgment on the pleadings, denied the plaintiffs' motions for summary judgment, and granted the defendants' motions for summary judgment in both cases.

All parties agreed that under *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the one-House veto provision of the Act was unconstitutional.

The district court concluded that the one-House veto provision was severable from the alternative pay plan provision because the provisions of the Act remaining after severance were fully operable as law, and the legislative history of the Pay Act did not demonstrate that Congress would not have enacted the alternative pay plan procedure without the one-House veto provision. The district court concluded that the alternative pay plan, absent the one-House veto provision, was not an unconstitutional delegation of legislative authority. The district court also rejected AFGE's argument that the 1985 alternative pay plan violated 5 U.S.C. § 5305(c)(2) because the plan increased pay on January 1, 1985, rather than in October 1984.

### ISSUES

The issues presented on appeal are:

(1) Whether the Pay Act, without a one-House veto provision, articulates policies or standards sufficient to confine the President's discretion in prescribing an alternative pay plan.

(2) Whether the legislative history of the Pay Act evidences that Congress would not have delegated to the President the authority to prescribe an alternative plan for adjusting federal employees' pay without providing for a one-House veto of the alternative plan.

(3) Whether the alternative pay plan for fiscal year 1984 violated the Pay Act by not implementing a pay increase until later than the first pay period after October 1, 1984.

### OPINION

### I

All parties agree that in light of the *Chadha* decision, the one-House veto provision contained in section 5305(c)(2) is unconstitutional. Based on *Chadha*, appellants argue that upon severance of the one-House veto provision from the Act, the alternative pay plan provision must be severed as well. They argue that, without the one-House veto provision, the alternative

pay plan cannot stand because it would improperly delegate legislative authority to the President and would violate congressional intent. Appellants ask this court to declare the alternative pay plan unconstitutional and to make the decision retroactive so that government employees covered by the Pay Act may receive the full comparability pay increases recommended by the pay agent for fiscal years 1980, 1981, 1983, and 1985.

In *Chadha*, the Supreme Court held one-House vetoes unconstitutional. The Court considered whether it could sever the offending one-House veto provision of the Immigration and Nationality Act from the remainder of the Act. The Court stated as the general rule of severability that "invalid portions of a statute are to be severed '[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.'" *Chadha*, 462 U.S. at 931–32, 103 S.Ct. at 2773–74 (quoting *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976)). The Court went on to explain that: "[a] provision is further presumed severable if what remains after severance 'is fully operative as a law.'" *Id.* at 934, 103 S.Ct. at 2775 (quoting *Champlin Refining Co. v. Corporation Comm'n of Oklahoma*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)).

Since the one-House veto applies only to the alternative pay plan provision and not to the remainder of the Act we must consider whether the alternative pay plan, stripped of the one-House veto, is within Congress' power to enact. If it is not, we need proceed no further. We need not address the question whether the remainder of the Act is within Congress' power to enact because the one-House veto does not apply to it and because neither party disputes the legality of any provision of the Act other than the one-House veto and the alternative pay plan provision.

The appellants argue that, without the one-House veto, the alternative pay plan is an improper delegation of legislative power

to the President and, therefore, that the alternative pay plan is beyond Congress' power to enact. The delegation doctrine is an aspect of the constitutional principle of separation of powers. The limitation on Congress' ability to delegate legislative power to the executive branch was early recognized by the Supreme Court. *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892).

The Court has summarized the delegation doctrine as follows:

> Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress had been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose....

*Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944). Thus, assuming that the President's power to set pay levels requires guidelines, the issue is whether the alternative pay plan provision provides a sufficient description of the policies and standards circumscribing the President's actions to determine whether he has obeyed the will of Congress. To make this determination we will compare the responsibilities under the alternative pay plan with legislative delegations that have previously been held valid.

The President may submit an alternative pay plan only when "because of national emergency or economic conditions affecting the general welfare, the President [considers] ... it inappropriate to make the pay adjustment required" to achieve full comparability. 5 U.S.C. 5305(c)(1). Under such conditions the President "shall prepare and transmit to Congress before September 1 of that year such alternative plan with respect to a pay adjustment as he considers appropriate, together with the reasons therefor...." *Id.* The report must "specify the overall percentage of the adjustment in the rates of pay under the General Schedule and of the adjustments in the rates of pay under the other statutory pay systems." *Id.* The alternative pay plan provision specifies why the plan is to be prepared, when the plan must be submitted, and what it must contain. It is implicit in the section that the pay adjustment in the alternative plan will be lower than that required by section 5305(a).

■ The standards for submission of an alternative plan are more specific than the provisions of other statutes with respect to which the delegation of authority has been upheld. In *Yakus v. United States,* for example, the Emergency Price Control Act of January 30, 1942, delegated to the Price Administrator authority to fix prices of commodities that " 'in his judgment will be generally fair and equitable and will effectuate the purposes of this Act.' " *Yakus,* 321 U.S. at 420, 64 S.Ct. at 665 (quoting Emergency Price Control Act of January 30, 1942, Pub.L. No. 77–421, § 202(a), 56 Stat. 23). The Court held that the statement of policy contained in the Act sufficiently constrained the Administrator's judgment. *Id.* at 423, 64 S.Ct. at 666. In *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), the Supreme Court considered whether the regulatory authority delegated to the Federal Communications Commission under the Communications Act of 1934 was an unconstitutional delegation. The Court found that the Commission's authority was adequately circumscribed by the standard of " 'public interest, convenience, or necessity' " contained in the Act. *Id.* at 215–16, 63 S.Ct. at 1009 (*quoting* Communications Act of 1934, Pub.L. No. 73–416, §§ 307(a)(d), 309(a), 310, 312, 48 Stat. 1064, 1083–87 (1934). In both *Yakus* and *National Broadcasting,* the standards limiting administrative action, while sufficient to determine compliance with legislative intent, were less specific than those provided by Congress in the Pay Act. We conclude that the Act prescribes sufficient standards to guide the President in submitting an alternative pay plan. *Cf. Atkins v. United States,* 556 F.2d 1028, 1060 (Ct.Cl.1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978) (Establishment of pay scales "though legislative in character, can

be delegated under proper standards, at least so long as Congress retains the ultimate authority."). Since the alternative pay plan provision is not an improper delegation of authority to the President, we conclude that it is within Congress' power to enact.

## II

Having addressed the question whether Congress was empowered to enact the alternative pay plan absent a one-House veto provision, we now consider whether Congress would have done so. In *Chadha*, determining that the legislature would have enacted the remainder of the Act without a one-House veto provision was a relatively easy task. Section 406 of the Immigration and Nationality Act provided that the remainder of the Act would not be affected by the severance of any particular provision of the Act.

Where, as here, the Act itself does not address the question of severability, the offending provision is presumed severable if what remains after severance is fully administratively operable as a law. The appellants may overcome the presumption of severability by showing that it is evident from the legislative history that Congress would not have passed the alternative pay plan without the one-House veto provision. *See Regan v. Time, Inc.*, 468 U.S. 641, 652–53, 104 S.Ct. 3262, 3269–70, 82 L.Ed.2d 487 (1984) (plurality opinion); *Alaska Airlines, Inc. v. Donovan*, 766 F.2d 1550, 1559–61 (D.C.Cir.1985), *cert. granted*, —— U.S. ——, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986).*

■ It is clear that the entire Act, including section 5305(c)(1), allowing the President to submit an alternative plan under certain prescribed conditions, is fully administratively operable as law absent the one-House veto provision in section 5305(c)(2). Thus, the presumption of severability arises.

Appellants argue that preserving the alternative pay plan while severing the one-House veto provision is inconsistent with the Act's policies. We agree that the dominant legislative policy behind the Pay Act was to maintain comparability between federal pay rates and those in private enterprise. 5 U.S.C. § 5301(a)(3). It is also evident from the legislative history that implementing an automatic mechanism for providing pay comparability was a major goal of the legislation. 116 Cong.Rec. 44,099–100 (1970) (statements of Sen. McGee); *Id.* at 44,284–286 (statements of Rep. Udall). It appears, however, that Congress was unwilling to apply the principle of full comparability automatically without some mechanism for limiting pay adjustments during periods of economic hardship. As Senator McGee explained:

> It was our feeling that comparability should be arrived at as a judgment in a far more scientific way than we have been prone to do up until now, and that in arriving at what is comparability, we have essentially removed the need for any critical serious judgment factor except in a national crisis of some sort, including an inflationary crisis, in which there is that reserve for the President of the United States.

116 Cong.Rec. 44,103.

Congress anticipated that the alternative pay plan would provide the necessary flexi-

---

* On the issue of severability, appellants argue that we should be guided by the result reached by the Fourth Circuit in *McCorkle v. United States*, 559 F.2d 1258, 1261–62 (4th Cir.1977), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). We decline such guidance for two reasons. First, *McCorkle* dealt with the severability of a one-House veto provision from the Federal Salary Act of 1967, Pub.L. No. 90–206, § 225(i), 81 Stat. 613, 644. In *McCorkle*, the court based its decision solely on the legislative history of the Federal Salary Act, and did not address the legislative history of the Pay Act, which is in question here. Second, to the extent we consider analysis of the severability of a provision of the Federal Salary Act helpful in resolving the questions before us, we find the analysis of Senior Judge Skelton's dissent in *Atkins v. United States*, 556 F.2d 1028, 1082–99 (Ct.Cl.1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978) more persuasive than that in *McCorkle*. Judge Skelton's dissent is essentially the analysis in *Chadha*.

bility in an otherwise essentially automatic process. *See* 116 Cong.Rec. 44,101–102 (statements of Sens. McGee and Holland); *id.* at 44,284–286 (statements of Rep. Udall). The legislative history and the presence of the alternative pay plan in the Act lead us to conclude that Congress did not intend to implement comparability pay increases at any cost. Rather, it chose to provide an executive alternative to full comparability pay increases for years in which national emergency or economic conditions affecting the general welfare make full comparability impractical. Furthermore, it appears that the Nixon administration supported an active pay-setting role for the President. Without such a provision, it is likely that a substantial number of members of Congress would not have voted for the Pay Act. *See* 116 Cong.Rec. 44,283 (statements of Reps. Ford and Udall); *id.* at 44,105 (statements of Sen. McGee).

■ We reject appellants' argument that without the one-House veto the President has "unchecked" authority to set federal pay levels. Congress recognized that if it did not approve of an alternative pay plan submitted by the President, it had the choice of exercising its one-House veto or legislating a pay plan different from either the alternative recommended by the President or the recommendation of the pay agent. The legislative option was clearly understood by the Senate and House sponsors of the conference committee report containing the conference substitute that ultimately became the Pay Act. 116 Cong. Rec. 44,100–102, 44104–105 (statements of Senator McGee); *id.* at 44,284 (statements of Rep. Udall). Nor has Congress been reluctant to use its legislative power to enact a comparability increase different from that proposed by the President. *See* Omnibus Budget Reconciliation Act of 1983, Pub.L. 98–270, § 202, 98 Stat. 157, 158 (1984).

The appellants argue that congressional ability to override the President's alternative pay recommendation legislatively is inhibited by the President's power to veto the legislation. This argument ignores the po-

litical reality that such overriding legislation is typically part of much more sweeping legislation that the President would not be likely to veto. Furthermore, the argument ignores the fact that Congress has enacted such legislation in the past.

Congressional activity in the federal pay area after *Chadha* sheds light on Congress' intent. *Chadha* was decided on June 23, 1983. On October 31, 1983, the President submitted to Congress an alternative pay plan for fiscal year 1984. Congress was aware of the impact of *Chadha* on the Pay Act's one-House veto provision when it considered overriding the President's alternative pay plan in the Omnibus Budget Reconciliation Act of 1983, Pub.L. No. 98–270, 98 Stat. 158 (1984). *See* H.R. Rep. No. 425, 98th Cong., 2d Sess. 5–7, *reprinted in* 1984 U.S.Code Cong. & Ad. News 355, 359–61. Despite the fact that Congress had reason to know that *Chadha* had invalidated the Pay Act's one-House veto provision, and that Congress was enacting new legislation adjusting federal pay, it did not take the opportunity to strike the alternative pay plan provision from the Pay Act. Nor has Congress done so in the Comprehensive Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, § 15201, 100 Stat. 82, 332 (1986). If, as the appellants maintain, the legislative will was as strongly opposed to granting the President authority to submit an alternative pay plan without the check of a one-House veto, it would be expected that in the years following *Chadha* Congress would have amended the Pay Act to eliminate the alternative pay plan provision.

■ Prior to the *Chadha* decision, Congress had, but did not use, its legislative veto. After the *Chadha* decision, Congress had, but has used only in 1984, the power to legislate a pay adjustment different from that proposed in the President's alternative pay plan. When Congress has failed to increase federal pay beyond the President's recommendations or to eliminate the alternative pay plan, this court will not presume to do so under the guise

of discerning legislative intent. Although the legislative history may be subject to varying interpretations, viewing that legislative history as a whole, we are not persuaded that Congress would not have enacted the alternative pay plan without the one-House veto.

### III

▉ Appellant AFGE contends that the alternative pay plan for fiscal year 1984 violates 5 U.S.C. § 5305(c)(2). Section 5305(c)(2) provides that: "An alternative plan transmitted by the President under paragraph (1) of this subsection becomes effective on the first day of the first applicable pay period commencing on or after October 1 of the applicable year," unless either House of Congress exercises its legislative veto. The fiscal year 1984 alternative plan provided for a pay adjustment effective January 1, 1985.

Section 5305(c)(2) does not provide that pay will be adjusted on the first day of the first applicable pay period commencing on or after October 1. Rather, it provides that an alternative plan transmitted by the President to Congress becomes effective on that date. Nothing in the Act requires the conclusion that an alternative plan must make a pay adjustment on the same date the plan becomes effective.

Congress' acts relating to pay comparability after the enactment of the Pay Act support this interpretation. In fiscal year 1984 the President submitted an alternative pay plan increasing rates of pay by 3.5 percent. Congress enacted legislation increasing rates of pay by 4 percent. In section 202 of the Omnibus Budget Reconciliation Act of 1983, Pub.L. No. 98–270, 98 Stat. 157, 158 (1984), Congress not only provided for an increase in the rate of pay but also provided that it would not be effective until "the first day of the first applicable pay period commencing on or after January 1 of such fiscal year." Likewise, in the Comprehensive Omnibus Reconciliation Act of 1985, Pub.L. No. 99–272, § 15201, 100 Stat. 82, 332 (1986), Congress opposed the President's alternative pay plan for fiscal year 1986 and placed limitations on federal pay increases in fiscal years 1987 and 1988. Section 15201(a)(2)(B)(ii) of the Act specifically makes pay adjustments to be made in 1987 and 1988 effective on or after January 1 of those fiscal years. Thus, presuming Congress has acted consistently with the Pay Act, it is evident that the Act was not intended to prevent the delay of a pay adjustment within a particular fiscal year.

### CONCLUSION

Accordingly, we hold that the Pay Act supplies adequate indication of congressional policies and standards to limit the President's discretion in proposing an alternative pay plan; that the one-House veto provision is severable from all of the remainder of the Pay Act; and that the alternative pay plan for the 1984 fiscal year complies with the Act. The district court's judgment is affirmed.

AFFIRMED.